IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION

UNITED STATES OF AMERICA

§
§
§
§

v.

§

MO:22-CR-00141-DC

§

(1) JEROSWASKI WAYNE
COLLETTE

§
§
§

## MEMORANDUM OPINION

The dust from the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen* is a long way from settling, and another case challenging the constitutionality of a firearm regulation has appeared before the Court. This time, the issue involves a defendant convicted by a jury for possessing a firearm as a felon in violation of federal law. So like many other defendants, the defendant here argues *Bruen* frees him from his jury conviction.

*Bruen* did shake up the legal landscape. And the Court believes that faithfully following *Bruen*'s new framework casts doubt on some firearm regulations. But the regulation in this case is not one of them. Thus, for the reasons explained below, Defendant's Motion to Dismiss Indictment is **DENIED**.

## BACKGROUND

Jeroswaski Collette ("Defendant") was arrested in June 2022 after police responded to a call of a man threatening an employee at a tow-truck company's impound lot. Defendant's vehicle had been repossessed, and he had been on the property retrieving personal items from his impounded vehicle, which included a holstered firearm. While leaving, Defendant allegedly threatened the employee with the firearm. When Defendant

returned to the lot later that day, the police were called, and they detained Defendant for questioning.

After receiving his *Miranda* warning at the scene, Defendant told police he had "done time" and owned two guns. Police verified that Defendant had a previous felony conviction and obtained a search warrant for Defendant's residence. There, officers found two guns matching Defendant's description—a tan Glock 19 and a black Smith & Wesson .40 caliber.

Defendant was charged with one count of knowingly possessing a firearm as a felon under 18 U.S.C. § 922(g)(1). On the day of his trial, Defendant moved to dismiss the indictment.[1] The Court carried Defendant's motion, and after trial, a jury convicted him. The Court now considers Defendant's motion.

Defendant makes facial and as applied challenges to the § 922(g)(1)'s constitutionality. But Defendant's arguments for both are the same—§ 922(g)(1) facially criminalizes possessing a gun as a felon. And the statute applies to Defendant because he was a felon possessing a firearm. Those facts are not disputed, a jury has already confirmed them. Because Defendant argues both challenges using *Bruen*'s framework, the Court tackles both in one analysis.

## DISCUSSION

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."[2] In *Heller*, the Supreme Court held that the Second Amendment protects "the

---

[1] Doc. 58.
[2] U.S. Const. Amend. II.

right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense."[3] And just last term, in *Bruen*, the Supreme Court held "consistent with *Heller* and *McDonald*, that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home."[4]

## I. The Supreme Court in *Bruen* laid out a new standard for courts to use when analyzing firearm regulations.

Before *Bruen*, courts of appeals had "coalesced around a "two-step" framework" when assessing Second Amendment claims, combining a historical analysis with means-end scrutiny.[5] For the first step, the court would establish the Second Amendment's original scope through a historical analysis.[6] If the regulated conduct fell outside the Amendment's original scope, "the analysis can stop there; the regulated activity is categorically unprotected."[7] But if not outside the Amendment's scope or "inconclusive," the court would proceed to step two.[8]

In step two, a court would generally analyze "how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right."[9] If the "core" Second Amendment right—self-defense in one's home—was burdened, the court would apply strict scrutiny.[10] Otherwise, it would apply intermediate scrutiny, considering

---

[3] *D.C. v. Heller*, 554 U.S. 570 (2008).
[4] *Bruen*, 142 S. Ct. at 2122.
[5] *Id.* at 2125.
[6] *E.g.*, *United States v. Focia*, 869 F.3d 1269, 1285 (CA11 2017).
[7] *United States v. Greeno*, 679 F.3d 510, 518 (CA6 2012).
[8] *E.g.*, *Kanter v. Barr*, 919 F.3d 437, 441 (CA7 2019).
[9] *Id.*
[10] *Kolbe v. Hogan*, 849 F.3d 114, 133 (CA4 2017).

whether the Government had shown that the regulation is "substantially related to the achievement of an important governmental interest."[11]

But in *Bruen*, Justice Thomas stated the two-step approach was "one step too many."[12] In its place, Justice Thomas enumerated a new standard courts must follow:

> "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."[13]

So the threshold question is whether the Second Amendment's plain text covers Defendant's conduct.

## II.    *Bruen*'s First Step: "possessing" a firearm under the Second Amendment's plain text.

The right to "keep and bear arms" shall not be infringed. A jury convicted Defendant under 18 U.S.C. § 922(g)(1), which makes it "unlawful for any person who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year to . . . possess any firearm or ammunition . . . which has been shipped or transported in interstate or foreign commerce."

Answering whether possession falls under "keep and bear" isn't complicated. According to Justice Scalia in *Heller*, to "keep arms" means to "have weapons." The plain meaning of "have" is "to be in possession of."[14] Thus, the Second Amendment's "keep and bear arms" language plainly encompasses possession.

---

[11] *Kachalsky v. County of Westchester*, 701 F.3d 81, 96 (CA2 2012).
[12] *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2127 (2022).
[13] *Id.* at 2129–30.
[14] *Have*, OXFORD ENGLISH DICTIONARY (3d ed. 2015).

That said, the Court notes that this is where *Bruen* conflicts with *Heller*. *Heller* called proscriptions against felons possessing guns "presumptively lawful."[15] In contrast, because possession is covered by the Second Amendment's plain text, *Bruen* makes a felon's possession of a firearm "presumptively constitutional."[16] *Bruen* is the controlling standard, but this conflict—the presumption of constitutionality—is what places the heavy burden on the Government.

In any event, *Bruen*'s first step asks a strictly textual question with only one answer: the Second Amendment's plain text covers possession of a firearm. Because the Constitution presumptively protects possessing a firearm, § 922(g)(1)'s constitutionality hinges on whether the Government can show that prohibiting felons from possessing a firearm is consistent with the Nation's historical tradition of firearm regulation.

## III.   *Bruen*'s second step: the historical analysis.

Upon reaching *Bruen's* second step, the Government must justify its regulation through a historical inquiry. Such an inquiry must show that the challenged regulation is consistent with the Second Amendment's scope as it was "understood to have when the people adopted [it]."[17] The historical understanding of the Second Amendment since ratification is the "critical tool of constitutional interpretation."[18]

The Court notes that the Government did not respond to Defendant's motion. But even without Government input, the Court stresses the importance of constitutional

---

[15] *D.C. v. Heller*, 554 U.S. 570, 627 n.26 (2008).

[16] *Bruen*, 142 S. Ct. at 2129–30.

[17] *D.C. v. Heller*, 554 U.S. 570, 634–635 (2008) (emphasis added).

[18] *Id.* at 605.

questions like the one here. Because of that importance, the Court conducts its own historical inquiry to ensure this constitutional question receives the imperative analysis.

### A.  Felons in possession: the Federal Firearms Act of 1938 to present.

The history of prohibiting felons from possessing firearms began in 1938, when Congress passed the Federal Firearms Act ("FFA").[19] The FFA prohibited those convicted of "a crime of violence" from shipping or transporting any firearms or ammunition in interstate commerce.[20] The Act's proscriptions were limited to those convicted of "crimes of violence," which was commonly understood to include only those offenses "ordinarily committed with the aid of firearms."[21]

According to the legislative history, Congress implemented the FFA to combat roaming criminals crossing state lines.[22] Without federal laws, ex-convicts would simply cross state lines to circumvent conditions of probation or parole.[23] The FFA's main goal then was to "eliminate the guns from the crooks' hands, while interfering as little as possible with the law-a-biding citizen."[24] In Congress's eyes, those convicted of crimes of violence had already "demonstrated their unfitness to be entrusted with such dangerous instrumentalities."[25]

Yet it wasn't until 1961 that felons were specifically prohibited from possessing firearms. Congress amended the FFA in 1961, removing the "crimes of violence" language,

---

[19] 5 Cong. Ch. 850, § 2(e), 52 Stat. 1250, 1251 (repealed).

[20] *Id.*

[21] C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 HARV. J.L. & PUB. POL'Y 695, 702 (2009).

[22] *United States v. Platt*, 31 F. Supp. 788, 790 (S.D.Tex.1940) (citing Record of Hearings on H.R. 9066 Before the House Committee on Ways and Means, 73d Congress).

[23] *Id.*

[24] S.Rep. No. 82, 75th Cong., 1st Sess. 2 (1937).

[25] *Cases v. United States*, 131 F.2d 916, 921 (1st Cir. 1942).

replacing it with a "crime punishable by imprisonment for a term exceeding one year."[26] Congress then expanded gun regulations yet again with the Gun Control Act of 1968 ("GCA").[27] The key amendments for § 922(g) included banning possessing and prohibiting receipt of any firearm that had traveled in interstate commerce.[28] And in 1986, all provisions as well as other sections that limited access to guns by dangerous persons, were separated and recodified under § 922(g).[29] So as of 2022, prohibiting felons from possessing firearms at the federal level is less than 65 years old.

### B. The straightforward historical inquiry.

If a challenged regulation addresses a "general societal problem that has persisted since the 18th century," this historical inquiry is "straightforward."[30] *Heller* did state, although in dicta, that there is a "longstanding" prohibition on felons possessing firearms.[31] Justice Scalia did not elaborate on what he meant by "longstanding." To bolster his argument that prohibiting felons from possessing a firearm is not longstanding, Defendant repeatedly cites then-Judge Amy Coney Barrett during her tenure on the Seventh Circuit in a case involving § 922(g)(1).

In *Kanter v. Barr*, now-Justice Barrett dissented from the majority opinion upholding the statute's constitutionality.[32] Justice Barrett noted in her dissent that "[t]he only evidence coming remotely close lies in proposals made in the New Hampshire, Massachusetts, and

---

[26] *See* Act of Oct. 3, 1961, Pub.L. No. 87–342, § 2, 75 Stat. 757 (repealed).
[27] Gun Control Act of 1968. Pub.L. 90–618, 82 Stat. 1213 (codified at 18 U.S.C. § 921 et seq.).
[28] *Id.* tit. I, § 102, 82 Stat. 1213, 1220-21; *id.* tit. III, §. 301, 82 Stat. at 1236 (all codified at 18 U.S.C. § 922(g); Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, tit. IV, § 925, 82 Stat. 197, 233-34; *id.* tit. VII, § 1202, 82 Stat. at 236.
[29] Firearms Owners' Protection Act, Pub.L. 99–308, § 110, 100 Stat 449 (1986).
[30] *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2131 (2022).
[31] *D.C. v. Heller*, 554 U.S. 570, 626 (2008).
[32] *Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) (Barrett, J. dissenting).

Pennsylvania ratifying conventions. In recommending that protection for the right to arms be added to the Constitution, each of these proposals included limiting language arguably tied to criminality."[33]

But that doesn't mean no historical evidence exists supporting disarming felons. Like Justice Barrett argues in *Kanter*, Pennsylvania's ratifying convention provides the strongest evidence.[34] In the convention, the influential Pennsylvania Minority suggested that the right to arms be guaranteed "unless for crimes committed, or real danger of public injury from individuals."[35] The Massachusetts and New Hampshire ratifying conventions also provide evidence, although to a lesser extent.

The Massachusetts convention's proposed amendment was that the Second Amendment "be never construed to authorize Congress . . . to prevent the people of the United States, who are peaceable citizens, from keeping their own arms."[36] Likewise, one of New Hampshire's proposed amendments was that "Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion."[37]

The common concern from all three states' conventions, however, appears to be threatened violence and the risk of public injury, not felons specifically or even criminals in general.[38] What's more, based on the Court's research, historians have pointed out that the British-American colonies "consistently refrained from [disarming] citizens."[39] After

---

[33] *Id.* at 454.

[34] *Id.* at 456.

[35] *Id.* (citing 2 Bernard Schwartz, The Bill of Rights: A Documentary History 681 (1971)).

[36] Bernard Schwartz, The Bill of Rights: A Documentary History 674–75, 681 (1971).

[37] *Id.*

[38] *Kanter*, 919 F.3d at 456.

[39] Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & HIST. REV. 139, 157 (2007).

scouring the colonies' existing legislative records from 1607 to 1815, one historian could not find "a single instance in which [the 14 colonies] exercised a police power to prohibit gun ownership by members of the body politic."[40]

And it wasn't until 1886 that a state court ruled on a firearm regulation that regulated "the condition of a person—rather than directly regulating his manner of carrying."[41] There, in *Missouri v. Shelby*, the Supreme Court of Missouri upheld a ban on carrying a deadly weapon while intoxicated.[42] So even with a longstanding general concern for public safety, history lacks direct examples about felons specifically. But just because there are no straightforward examples does not mean the Court's historical inquiry stops there.[43]

## IV.  *Heller*, other constitutional provisions, and "the people."

With the straightforward historical inquiry unclear, a more nuanced approached is necessary. When a more nuanced approach is needed, courts can reason by analogy, which involves finding a historical analogue that is "relatively similar" to the modern regulation.[44]

The challenged regulation in this case, like other § 922 regulations, categorically restricts "who" may exercise their Second Amendment rights. Under the Second Amendment, the "who" imbued with the right to keep and bear arms is "the people"—a term of art. But this term of art doesn't appear only in the Second Amendment.

---

[40] *Id.* at 142.

[41] C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 HARV. J.L. & PUB. POL'Y 695, 711 (2009).

[42] 2 S.W. 468 (Mo. 1886).

[43] The Court acknowledges that after conducting her thorough historical analysis pre-*Bruen*, Justice Barrett stated that "[h]istory does not support the proposition that felons lose their Second Amendment rights solely because of their status as felon." Unlike this Court does below, Justice Barrett does not analogize to other constitutional provisions, moving on to a means-test analysis abrogated by *Bruen*.

[44] *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2131 (2022).

The Constitution's first words trumpet, "We the people," a sharp contrast to the British view that the sovereignty of the people was embodied in the monarchy.[45] That contrast was intended; the founders rejected British notions of "sovereign" governmental omnipotence.[46] The founders instead placed "that pure, original fountain of all legitimate authority" with the people.[47] Starting with "the people" was on purpose—"words made flesh by the constitution itself. The Constitution, after all, was not just a text, but an act—a doing, a constitut*ing*."[48] And these "words made flesh" are not only referenced in the preamble and the Second Amendment.

### A.  How Heller defined "the people."

Justice Scalia's majority opinion in *Heller* highlighted that "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all *members of the political community*, not an unspecified subset."[49] Yet this Court notes that Justice Scalia slightly altered the Supreme Court's previous definition of "the people" from *United States v. Verdugo-Urquidez*.[50] There, the Supreme Court had previously defined "the people" as "persons who are part of a national community."[51]

So in effect, Justice Scalia narrowed the definition of "the people" to those with the rights of the "political community." *Heller*'s definition then implies that "the people" means only those with political rights.

---

[45] U.S. Const. pmbl; Akhil Reed Amar, *Of Sovereignty and Federalism*, 96 YALE L.J. 1425. 1435 (1987).
[46] Amar, 96 YALE L.J. at 1435 (1987).
[47] THE FEDERALIST NO. 22, at 152 (A. Hamilton); *see also id.* No. 49, at 313 (J. Madison) ('the people are the only legitimate fountain of power').
[48] Akhil Reed Amar, The Bill of Rights: Creation and Reconstruction 48 (Yale University Press 1998).
[49] *D.C. v. Heller*, 554 U.S. 570, 580 (2008) (emphasis added).
[50] 494 U.S. 259, 265 (1990).
[51] *Id.*

History supports defining "the people" that way. For example, at the time of the Second Amendment's ratification, the right to vote, hold public office, or serve on a jury were thought of as equal to keeping and bearing arms because all were so-called "political rights."[52]

And the historical support is not out-of-bounds with courts post-*Heller*. Indeed, courts post-*Heller* have followed *Heller*'s implication that "the people" means only those with political rights. For example, in *United States v. Portillo-Munoz*, the Fifth Circuit held that Second Amendment rights do not extend to undocumented immigrants because they are not among "the people" of that amendment.[53] *Heller* described Second Amendment rights as inuring to "law-abiding, responsible citizens" and "all Americans."[54] Therefore, because undocumented immigrants are not law-abiding citizens, Americans, or members of the political community, they could be excluded from "the people."[55]

Besides defining "the people," *Heller* also states that "the people" means the same thing throughout the Constitution.[56] Indeed, both *Heller* and *Bruen* recognize a consistent usage within the Constitution.[57] Interpreting an individual provision in the context of the Constitution's full text is not novel. Indeed, Chief Justice Marshall reasoned over 200 years ago that the Constitution calls for a "fair construction of the whole instrument.[58] Therefore, if the meaning is the same throughout the Constitution, other constitutional provisions

---

[52] Akhil Reed Amar, The Bill of Rights: Creation and Reconstruction 48 (Yale University Press 1998).
[53] 643 F.3d 437, 440 (5th Cir. 2011).
[54] *Id.* at 442.
[55] *Id.*
[56] *D.C. v. Heller*, 554 U.S. 570, 580 (2008).
[57] *Id.*; *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2130 (2022).
[58] *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 406 (1819) (Marshall, C.J.).

enshrining rights or powers to "the people"—and critically, who can be categorically excluded from "the people"—provide similar historical analogues.

That said, the Court acknowledges the tension such an interpretation creates. Like Justice Stevens noted in his *Heller* dissent, Justice Scalia failed to harmonize his restriction of "the people" to "law-abiding, responsible citizens" with its assertion that "the people" means the same group in the First and Fourth Amendment.[59] Justice Scalia limited "the people" by defining it as "members of the political community." "But the class of persons protected by the First and Fourth Amendments is *not* so limited; for even felons (and presumably irresponsible citizens as well) may invoke the protections of those constitutional provisions."[60]

This tension has created an ongoing debate, but this Court does not wade into that debate. Whether "the people" is consistent across all constitutional provisions or not, the tradition of categorically excluding certain groups from the rights and powers of "the people" still provides useful analogies.

## B.  Restrictions on the power of "the people" to vote in Section 2, Article I.

*Heller* defined "the people" as members of the political community, implying the phrase is limited to those with political rights like voting. And analogous to the Second Amendment, the constitutional provision bestowing the power of choosing the House of Representatives also gives that power to "the people."

---

[59] *Heller*, 544 U.S. at 644 (Stevens, J. dissenting).
[60] *Id.*

Section 2, Article I of Constitution states, "the House of Representatives shall be composed of Members chosen every second Year by the People of the several States."[61] Put simply, it's the right of the people to vote. And excluding those convicted of a crime from the people's right to vote does have a "longstanding" historical tradition in this country.

Indeed, there was a "longstanding" historical tradition from the time of ratification that those convicted of a crime could be excluded from the right to vote.[62] For example, one year after the Second Amendment's ratification, Kentucky's Constitution stated, "[l]aws shall be made to exclude from . . . suffrage those who thereafter be convicted of bribery, perjury, forgery, or other high crimes and misdemeanors."[63] Vermont's Constitution followed one year later, authorizing the removal of voting rights from those engaged in bribery or corruption during elections.[64] As of 2022, only two states and the District of Columbia do not restrict felons' voting rights.[65]

So if the definition of "the people" is consistent throughout the Constitution—and it has been historically constitutional to exclude those convicted of a crime from "the people" under Section 2, Article I —it would also be constitutional then to exclude those groups from the Second Amendment's kindred "political right."

## C. Regulating the rights of "the people" to assemble.

Another constitutional provision granting rights to "the people" is the First Amendment's Assembly-and-Petition clause. The First Amendment states, "Congress shall

---

[61] U.S. Const. art. I, §2.
[62] *Id.* at 605.
[63] Kentucky Const. art. VIII § 1.2 (1792).
[64] Vermont Const. Ch. II § 34 (1793).
[65] State Voting Laws & Policies for People with Felony Convictions, Britanica (as of August 1, 2022) State Voting Laws & Policies for People with Felony Convictions - Felon Voting - ProCon.org.

make no law . . . abridging . . . the right of the people peaceably to assemble, and to petition the government for a redress of grievances." The "very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably."[66] But this right is not absolute—the Supreme Court has excluded groups from the people's right of assembly.

In *De Jonge v. Oregon*, the Supreme Court declared the right to peaceful assembly "equally fundamentally" with other First Amendment clauses.[67] There, De Jonge was charged under a state criminal syndicalism statute after speaking at a Communist party meeting.[68] Although the objectives of the Communist Party are heinous, the Supreme Court held that De Jonge "still enjoyed his personal right . . . to take part in a peaceable assembly having a lawful purpose."[69]

Yet the Supreme Court also highlighted the right of assembly "without incitement to violence or crime."[70] Indeed, much like the right to keep and bear arms, the First Amendment's right to assembly can be abused to incite violence or crime. Thus, legislation protecting against such abuses would be constitutional if "made only against the abuse."[71] The rights themselves may not be curtailed.[72]

The Supreme Court has also held that the Government can restrict the right to assembly when there is a "clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order."[73] Or like

---

[66] *United States v. Cruikshank*, 92 U.S. 542, 352 (1875).
[67] 299 U.S. 353, 364 (1937).
[68] *Id.* at 359.
[69] *Id.* at 365.
[70] *Id.*
[71] *Id.* at 364.
[72] *Id.* at 365.
[73] *Cantwell v. State of Connecticut*, 310 U.S. 296, 308 (1940).

the Supreme Court held in *Brandenburg v. Ohio*, only when "advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action" can the Government prevent that advocacy.[74] Prior restraints against such dangers, however, incur a heavier burden.

But in the Second Amendment context, restrictions against those already convicted of a crime, for example, would not be a prior restraint—they have already been found guilty in a constitutionally sufficient proceeding. Likewise, the right of the people does not protect violent actors or criminals. Indeed, those who abuse the right and jeopardize public safety, peace, or order can be excluded from "the people." So if "the people" means the same under the First and Second Amendments—and those who abuse their rights to commit crimes and violence can be constitutionally excluded from the First Amendment's protections—the same may be excluded from the Second Amendment's protections.

### D.  There is a historical tradition of excluding felons from "the people."

In sum, *Heller* identified the right to keep and bear arms as held by "members of the political community." And in doing so, Justice Scalia stated that all constitutional provisions mentioning "the people" were consistent. Through the historical analogies above, the Court's inquiry is clear—this Nation has a historical tradition of excluding felons and those who abuse their rights to commit violence from the rights and powers of "the people." Consistent with *Heller*'s definition, if groups have been categorically excluded under other constitutional provisions bestowing rights to "the people," logic demands that society could also exclude those groups from under the Second Amendment.

---

[74] *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969).

This is also consistent with the founders' idea of popular sovereignty: giving "the people" the right to govern themselves. Put differently, it's the right within the Constitution's structure to exclude those who abuse the rights of "the people." And the people have wielded this right constitutionally under provisions declared equal by the Supreme Court—so exercising that right under the Second Amendment should be no different. Thus, § 922(g)(1) is constitutional on its face and as applied to Defendant.[75]

**E. Rights are not free**.

This Court recently held unconstitutional § 922(n), which prohibited receipt of a firearm by those under indictment. In its ruling, the Court noted various concerns about stripping someone's constitutional rights through a process lacking basic procedural safeguards. Those concerns do not exist here.

Felons are those already convicted through a process where the defendant is afforded every applicable constitutional guarantee. And it's the defendant's peers that convict, an act that functions as a free society's repudiation of the convicted's conduct. But until that moment, a person maintains the presumption of innocence. Although the time between indictment and conviction may appear immaterial to some, that fine line makes all the difference. The Constitutional rights granted to "the people" do not fade in and out; they are a constant bulwark for *all* "the people."

Yet these rights come at a cost. Ensuring that society's worst enjoy the same constitutional protections as everyone else is a difficult pill to swallow. Consider the right of

---

[75] The Court does not analyze whether there is a difference between violent and non-violent felons. Section 922(g)(1) says "*a crime* punishable by imprisonment for a term exceeding one year," and the Court will not read two competing definitions of "a crime" into the statute. Even so, the Court believes there is still much left unknown post-*Bruen*.

the people to peacefully assemble, which allows abominations like the Klu Klux Klan or the Communist Party to parade down main street, spreading vile messages.[76] Or like how affording Fifth Amendment *Miranda* rights to suspected criminals may allow incriminating confessions to be suppressed, thus letting undeserving criminals—who will likely commit other crimes—walk free.[77] Yet "it is better to let the crime of a guilty person go unpunished than to condemn the innocent" because the reward far outstrips the cost [78]

The Constitution is, of course, just words. They are "what our Framers would have called a parchment guarantee."[79] Indeed, "every banana republic in the world has a bill of rights."[80] Thus, it is not the empty words but the sacrifices—the unflinching commitment to protecting the rights of the people—that make this country what it is.

## CONCLUSION

A free society has the right to punish but "prefers to punish the few who abuse rights of [the people] after they break the law than to throttle them and all others beforehand."[81] Felons are those who have abused the rights of the people. And as outlined above, this Nation has a "longstanding" tradition of exercising its right—as a free society—to exclude from "the people" those who squander their rights for crimes and violence. Consistent with *Heller* and *Bruen,* the Second Amendment should be no different here. As a result, the Court

---

[76] *See Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969); *De Jonge v. Oregon*, 299 U.S. 353, 364 (1937).
[77] *Miranda v. Arizona*, 384 U.S. 436 (1966).
[78] *Coffin v. United States,* 156 U.S. 432, 454 (1895).
[79] Justice Antonin Scalia, Opening Statement on American Exceptionalism in the Senate Judiciary Committee (Oct. 5, 2011).
[80] *Id.*
[81] *Collin v. Smith*, 578 F.2d 1197, 1207 (7th Cir. 1978) (citing *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975).

holds that § 922(g)(1) is constitutional on its face and as applied to this Defendant.

Defendant's Motion to Dismiss Indictment is accordingly **DENIED**.

It is therefore **ORDERED** that Defendant's Motion to Dismiss Indictment is

**DENIED** (Doc. 58).

It is so **ORDERED**.

SIGNED this 25th day of September, 2022.

_____
DAVID COUNTS
UNITED STATES DISTRICT JUDGE